HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

HAMER ELECTRIC, INC., a Washington corporation,

                                        Plaintiff,

v.

TMB-NW LIQUIDATION, LLC, formerly known as BROWN-MINNEAPOLIS TANK-NORTHWEST, LLC, a New Mexico limited liability company; BMT ACQUISITION, LLC, a Delaware limited liability company; BMT-NW ACQUISITION, LLC, a Delaware limited liability company; and CHARLES WILLIAM TRAVELSTEAD and ANN TRAVELSTEAD, husband and wife, and their marital community,

                                        Defendants.

Case No.  3:12-cv-05332-RBL

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## **INTRODUCTION**

The Defendant/Debtor BMT-NW was seriously under water financially in 2011.  BMT-NW

failed to pay many vendors who supplied materials to its production process.  These vendors,

including Hamer and Walker, were unsecured creditors.  They sued BMT-NW, obtained default

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1**

judgments, conducted supplemental proceedings and finally commenced this action for the purpose of collecting on their judgments.

BMT-NW also had much bigger financial problems.  It had a Promissory Note and a Line of Credit Note with Chase Bank which were properly secured and on the verge of default.  Ultimately, Chase forced BMT-NW's hand to resolve its financial crisis.  Chase Bank was operating as an independent entity, in pursuit of its self-interest.  Longboard ultimately purchased the Chase notes as an independent entity pursuing its own self-interest.  Charles Travelstead was also acting as an independent party motivated by his own self-interest.  The three parties engaged in arms-length transactions to accomplish the following:

a) Longboard, through a separate entity, purchased the notes from Chase at a steep discount that recognized the financial reality of BMT-NW and BMT;

b) Longboard foreclosed on all the assets of BMT-NW;

c) Longboard wanted to purchase a going concern;

d) To do that, Longboard negotiated with Travelstead to work for a salary and a small equity interest in the emerging holding company;

e) The assets of BMT-NW were not sufficient to satisfy its debts; and

f) Many unsecured creditors were left unpaid.

The credible evidence produced at trial fails to establish that Travelstead did anything unlawful to cause assets of BMT-NW to be placed outside of the reach of its unsecured creditors.  Therefore, the following **Findings of Fact and Conclusions of Law** are adopted.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2**

# FINDINGS OF FACT

1.      Defendant TMB-NW Liquidation, LLC ("BMT-NW) is a limited liability company formed under the laws of New Mexico in 2001.  The initial name of the company was Reliable Steel – Eidson – BMT, LLC, and was later changed to Brown Minneapolis Tank-Northwest, LLC.  In November, 2011 its name was changed to TMB-NW Liquidation, LLC.  Since the formation of BMT-NW, Defendant Charles Travelstead has served as a director and its president, and he has also always been a member.  Travelstead and his wife, Ann Travelstead, reside in Albuquerque, New Mexico and are currently the only members of BMT-NW.

2.      Plaintiff Hamer Electric, Inc. is a Washington corporation and provides services as an electrical contractor registered under Chapter 18.27 RCW under license number HAMERE1295NBU.  Hamer's principal place of business is in Cowlitz County, Washington.

3.      Plaintiff Walker Specialty Construction, Inc. ("Walker") is a Washington corporation doing business under UBI 601634484 offering specialty construction and associated services.

4.      BMT-NW was a manufacturer specializing in large steel plate fabrication of tanks and structures.  Its corporate headquarters has always been in Albuquerque, New Mexico.  BMT-NW operated a facility in the State of Washington.

5.      To meet its ongoing financial needs, BMT-NW executed a Credit Agreement and a separate Continuing Security Agreement with J.P. Morgan Chase Bank, N.A. ("Chase") in December, 2009. BMT-NW executed a Term Note and Line of Credit Notes with Chase (collectively the "Chase Notes"). The Term Note was in the amount of $2,200,000.  The Line of Credit Note was for $1,200,000.

6.      As part of these agreements, BMT-NW granted Chase a continuing security interest in all of BMT-NW's assets (the "Collateral").  The Collateral was described in the Continuing Security Agreement as:

> "accounts"; "chattel paper"; "deposit accounts" and other payment obligations of financial institutions (including the Bank); "documents"; "equipment", including any documents and certificates of title issued with respect to any of the equipment; "general intangibles" and any right to a refund of taxes paid at any time to any governmental entity; "instruments"; "inventory', including any documents and certificates of title issued with respect to any of the inventory; "investment property"; "financial assets"; "letter of credit rights"; all as defined in the UCC, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located.   In addition, the term "Collateral" includes all "proceeds", "products" and "supporting obligations" (as such terms are defined in the UCC) of the Collateral, including but not limited to all stock rights, subscription rights, dividends, stock dividends, stock splits, or liquidating dividends, and all cash, accounts, chattel paper, "instruments," "investment property," "financial assets." and "general intangibles" (as such terms are defined in the UCC) arising from the sale, rent, lease, casualty loss or other disposition of the Collateral, and any Collateral returned to, repossessed by or stopped in transit by the Borrower, and all insurance claims relating to any of the Collateral.  The term "Collateral" further includes all of the Borrower's right, title and interest in and to all books, records and data relating to the Collateral, regardless of the form of media containing such information or data, and all software necessary or desirable to use any of the Collateral or to access, retrieve, or process any of such information or data.

7.      The Chase Notes were personally guaranteed by the Travelsteads.

8.      On February 4, 2010, Chase filed a UCC-1 financing statement to perfect its security interest in the Collateral.  In addition, liens against vehicles were perfected by noting liens on the titles of the vehicles.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4**

9.      All of the assets of BMT-NW were subject to a valid security interest granted to Chase.  John Clees, an expert witness appearing for Hamer and Walker, conceded that all of the assets of BMT-NW were subject to a security interest held by Chase.

10.     The February 4, 2010 promissory note signed by Mr. Travelstead was never delivered to BMT-NW and was never reported on the balance sheet of BMT-NW as an asset. Even if Mr. Travelstead did owe money to BMT-NW under a  promissory note, the promissory note would have been subject to security interest held by Chase under the Continuing Security Agreement.  Clees conceded that the definition of Collateral encompassed promissory notes, held by BMT-NW.

11.     In 2010, BMT-NW and Chase amended the Line of Credit Note, increasing the principal amount by $500,000 to $1,700,000.

12.     Around December 2010, Chase declared that BMT-NW was in default under the Credit Agreement.  Chase subsequently withdrew the default and agreed to modify the Chase Notes, twice extending the due dates to May 31, 2011.

13.     As of May, 2011, BMT-NW owed Chase almost $2.9 million under the Chase Notes.  At the same time, BMT-NW owed unsecured creditors approximately $2.6 million.  Of that balance, over 72% was over 90 days past due.

14.     In May, 2011, Chase conducted its own, internal analysis of the liquidation value of the BMT-NW assets that secured the Chase Notes.  Chase concluded that if the assets of BMT-NW were liquidated, its likely net recovery was $608,000.  Chase also concluded that it was unlikely to recover any amounts under the Travelstead personal guarantees.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5**

15.     Throughout 2011, Mr. Travelstead actively sought persons who would purchase, invest in and/or lend funds to BMT-NW.  Mr. Travelstead met with over a dozen representatives of investment banks, private equity firms, venture capital firms and commercial banks.

16.     In late May, 2011, Chase directed Mr. Travelstead to hire a consultant to evaluate the business and financial condition of BMT-NW.   From a list provided by Chase, Mr. Travelstead selected SG Consulting.   At the end of May 2011, SG was formally retained to perform its evaluation.

17.     SG analyzed BMT-NW's business operations and financial condition and published a report.   SG presented Chase with three potential options for BMT-NW, (1) the orderly wind down and sale of the assets of BMT, (2) a Chapter 11 reorganization under the federal bankruptcy code; or (3) the sale of the Chase Notes for a price acceptable to Chase.  SG presented its report to Chase on June 7, 2010.

18.     At the time SG presented its conclusions to Chase, the secured debt owed by BMT-NW to Chase was $2,885,334.

19.     SG opined that the filing of a Chapter 11 bankruptcy petition was not a viable option.  SG believed that cost of the bankruptcy process together with doubts about the viability of BMT-NW's business made bankruptcy an inappropriate option.   A Chapter 11 bankruptcy would not have been viable for BMT-NW.

20.     SG estimated the net liquidation value of the assets of BMT-NW at $ 1.046 million.  The SG valuation was an accurate estimate of the fair market value of the assets.

21.     Chase decided to sell the notes and related security rights in the assets of BMT-NW.   Chase received two offers for the notes.   One was from a company known as Aterion.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6**

Aterion offered Chase approximately 36% of the face value of the notes, or approximately $1.1 million.  Longroad Capital Asset Management offered Chase a higher amount of approximately of 42% of the face value of the notes, or approximately $ 1.3 million.

22.     On June 16, 2011, NW Acquisition entered into a Loan Purchase and Sale Agreement with Chase to purchase the Chase Notes and all related security interests and loan documentation.  The balance on the Chase Notes was, at the time, $2,978,519.96.  The purchase price was $1,352,127.18.  The purchase price for the Chase Notes was over two times the value Chase had placed on the assets of BMT-NW. The purchase price was also 29% higher than the value placed on the BMT-NW assets by SG Consulting.

23.     Mr. Travelstead did not participate in the negotiations over the purchase and sale of the Chase Notes.

24.     Longroad formed BMT-NW Acquisition, LLC ("NW Acquisition") in Delaware on June 10, 2011.  NW Acquisition purchased the Chase Notes.

25.     NW Acquisition's Operating Agreement was signed on June 10, 2011, and amended on June 30, 2011.  The Managers of NW Acquisition were Leon Komkov, Richard Latto, Anne Whitman, and Steve Zambito.

26.     Broad Street Tank Holdings Co., Inc., a Delaware corporation, was the sole member of NW Acquisition.  The initial board of directors of Broad Street consisted of Leon Komkov, Anne Whitman, Rich Latto, and Steve Zambito.

27.     At no time was Mr. Travelstead a member or manager of NW Acquisition.

28.     As of the time of the purchase of the debt, BMT-NW was running out of cash and was struggling to meet its financial obligations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 7**

29.     On June 17, 2011, NW Acquisition and BMT-NW amended the terms of the Credit Agreement ("Credit Amendment").   Under this Credit Amendment, NW Acquisition advanced $367,598 to BMT-NW.   These additional funds were necessary for BMT-NW to continue operations.

30.     The Credit Amendment did not grant a security interest in any asset of BMT-NW that was not already subject to a security interest under the Chase Continuing Security Agreement.

31.     Related to this Credit Amendment, on June, 17, 2011, Brown-Minneapolis Tank Co. ("BMT") and BMT-NW executed cross guarantees to guaranty each other's debts in favor of NW Acquisition and BMT Acquisition, respectively.

32.     The cross guarantee did not impair or put at risk any asset of BMT-NW that was not already subject to a security interest under the Chase Continuing Security Agreement.   The cross guarantee did not impair the ability of BMT-NW to operate.

33.     The Credit Amendment included a section which clarified the definition of the Collateral.   This clarification identified ownership rights of BMT-NW in Super Technologies, LLC, "Kleerwater Technologies, LLC, Brown Minneapolis Tank-Canada Co. and Brown Minneapolis Tank-ULC".   This change was not an expansion of the Collateral which secured the Chase Notes.   The Chase Continuing Security Agreement granted to the lender a security interest in any securities owned by BMT-NW.   Furthermore, BMT-NW did not own any interest in Kleerwater Technologies, LLC, Brown Minneapolis Tank-Canada Co. or Brown Minneapolis Tank-ULC.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8**

34.     On June 30, 2011, NW Acquisition amended Chase's UCC filing to reflect that it was the secured party under the Continuing Security Agreement.

35.     On July 7, 2011, NW Acquisition sent a letter of default requesting BMT-NW satisfy the over $3 million principal balance owing to NW Acquisition.  The default was consistent with the rights of NW Acquisition under the Chase Notes and the rights of NW Acquisition under the Continuing Security Agreement acquired by NW Acquisition from Chase.

36.     BMT-NW was legally obligated to pay off the amount demanded or tender the Collateral to NW Acquisition.

37.     At the time, BMT-NW's total outstanding principal debt to NW Acquisition amounted to $3,307,443. BMT-NW did not have the financial ability to pay off the amount owed its secured lender.   At the time, BMT-NW, did not even have funds sufficient to continue operations.

38.     Mr. John Clees, an expert testifying for Hamer and Walker, testified that Chase would likely have foreclosed on the assets if the Chase Notes had not been purchased.

39.     Hamer and Walker did not produce any evidence that any alternative existed for BMT-NW that would have resulted in Hamer and Walker getting paid by BMT-NW.

40.     In spite of the default notice, Mr. Travelstead continued to investigate financing options to pay off the amount demanded by NW Acquisition and continue operations.

41.     On behalf of BMT-NW, Mr. Travelstead negotiated in good faith a foreclosure agreement with NW Acquisition pursuant to which NW Acquisition would forgive a portion of the secured debt in exchange for substantially all of the assets of BMT-NW.  During those

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9**

negotiations, Mr. Travelstead urged NW Acquisition to agree to pay the unsecured creditors of BMT-NW.

42.     On July 29, 2011, BMT-NW executed a Foreclosure Agreement with NW Acquisition in which NW Acquisition foreclosed on all the assets of BMT-NW identified in the Agreement in exchange for $1,600,000 in partial satisfaction of BMT-NW's indebtedness to NW Acquisition.  NW Acquisition also agreed to pay approximately $ 700,000 of unsecured debt of BMT-NW.

43.     The assets to be transferred to NW Acquisition under the Foreclosure Agreement consisted of all of the assets of BMT-NW.  At the time of the foreclosure, BMT-NW did not have any assets that were not subject to a security interest held by NW Acquisition.

44.     The definition of the assets to be transferred under the Foreclosure Agreement would have encompassed any promissory notes owed by Mr. Travelstead to BMT-NW. Therefore, even if Mr. Travelstead did owe money to BMT-NW under a promissory note, any such note would have been transferred to NW Acquisition under the terms of the Foreclosure Agreement.   Also included in the assets to be transferred were any securities owned by BMT-NW and any receivables from any person, including receivables from affiliated companies.

45.     The value of the assets of BMT-NW that were transferred to NW Acquisition under the Foreclosure Agreement were less than the consideration given by NW Acquisition for the assets of BMT-NW.

46.     Jay Sickler, a valuation expert who testified for Mr. Travelstead, confirmed that the valuation performed by SG used the appropriate methodology given the circumstances at the time of foreclosure, and was performed consistent with professional standards. Mr. Sickler

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10**

testified that the value of $ 1.046 million placed on the assets of BMT-NW by SG Consulting was an accurate estimate of the fair market value of those assets at the time of the foreclosure. Mr. Sickler conducted his own analysis and estimated the fair market value of the assets was $1 million at the time of the foreclosure.

47.     At the time of the foreclosure, it would not have been appropriate to value BMT-NW as a going concern given the dire financial condition of BMT-NW.  It was not profitable and was in default to its secured lender.   At the time of the foreclosure, BMT-NW did not have the financial ability to fund its operations.

48.     Three separate persons placed a value on BMT-NW's assets that was far less than the consideration given by NW Acquisition under the foreclosure agreement: Chase ($608,000), SG Consulting ($1.046 million) and Mr. Sickler ($1 million).

49.     Neither Hamer nor Walker offered testimony from any expert or other witness that challenged the validity of the value of the assets determined by these persons.  Neither Hamer nor Walker offered any evidence that, at the time of the foreclosure, the fair market value of the assets of BMT-NW was higher than the consideration given by NW Acquisition under the Foreclosure Agreement.

50.     Therefore, NW Acquisition gave reasonable equivalent value to BMT-NW for the assets.

51.     Pahl Industrial, Inc. conducted an appraisal of a list of assets of NW Acquisition in December, 2011 (the ("Pahl Appraisal").  The Pahl Appraisal does not establish what the fair market value of the assets was at the time of the foreclosure.  The Pahl Appraisal was obtained for the purpose of establishing a book value of certain assets of NW Acquisition.  The book

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 11**

value of an asset is not an appropriate valuation for determining the fair market value of the assets of a company that is in financial distress.  The Pahl Appraisal's valuation was based on assumptions that were not present at the time of the foreclosure.  The appraisal assumed that the assets would be sold over a six to twelve month time period and that sufficient competitive bidders would be attracted.  The appraisal also is an accurate estimate of fair market value because it does not account for the costs of selling the assets.  The unrefuted conclusion of SG placed the liquidation costs at approximately $900,000.  Those costs would reduce the gross liquidation number in the Pahl Appraisal.

52.    In addition, the Pahl Appraisal is not an accurate indication of the fair market value of the assets because the list of assets upon which the appraisal is based includes approximately $1.2 million of items which were not owned by BMT-NW.

53.    Finally, the Pahl Appraisal is of marginal probative value because of the unverifiable information it contains.  The appraisal is based on information provided by multiple unidentified sources.

54.    Following the foreclosure, NW Acquisition continued to hold over $1,700,000 of BMT-NW debt that was secured by any assets which remained in the possession of BMT-NW.

55.    The Foreclosure Agreement does not, as part of its terms, include a release of Mr. Travelstead from his guarantee of the Chase Notes.

56.    Following the foreclosure, Mr. Travelstead executed an employment agreement to serve as CEO of Broad Street, and CEO of BMT Acquisition, NW Acquisition and Graver Tank.  Prior to this time, Mr. Travelstead had no authority to act on behalf of NW Acquisition.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 12**

57.     Mr. Travelstead received and currently owns shares in Broad Street.  Mr. Travelstead received his ownership interest, five percent, in Broad Street in exchange for his ownership interest in Graver Tank Co.  That agreement was effective on August 12, 2011.  Mr. Travelstead provided consideration for his interest in Broad Street that was independent of any obligation under the Foreclosure Agreement.

58.     Following the foreclosure, Mr. Travelstead did not owe money to BMT-NW under a promissory note dated February 4, 2010.  Even if Mr. Travelstead did owe funds to BMT-NW under a note, any such note would have been an asset of the BMT-NW that was transferred to NW Acquisition under the Foreclosure Agreement.  The February 4, 2010 promissory note does not represent an asset that could have been recovered by Walker or Hamer.

59.     Any compensation or benefits given to Mr. Travelstead from Broad Street did not in any way adversely affect the ability of Hamer or Walker to collect the amounts owed to them by BMT-NW.

60.     The transaction that resulted in Mr. Travelstead receiving an ownership interest in Broad Street did not in any way adversely affect the ability of Hamer or Walker to collect the amounts owed to them by BMT-NW.

61.     NW Acquisition released Mr. Travelstead from his personal guarantee of the Chase Notes.  This release did not in any way adversely affect the ability of Hamer or Walker to collect the amounts owed to them by BMT-NW.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13**

62.     Any assets remaining in the possession of BMT-NW following foreclosure remained subject to the security interest of NW Acquisition.  Following the execution of the foreclosure agreement BMT-NW owed NW Acquisition a total of over $ 1.8 million, not including its obligation under the cross guarantee of BMT's financial obligations.

**[1]

63.     Any assets listed on balance sheet of BMT-NW after the foreclosure had no value. The July 29, 2011 balance sheet of BMT-NW included a receivable account described as "amounts due from related entities."  The amount shown on this balance sheet was $ 834,917. This balance sheet was prepared by the company's outside accountant, Mr. John Wright, who had served in that capacity for twenty years.

64.     This receivable account consisted of uncollectible balances from an insolvent, affiliated company.  During the years of BMT-NW's operation, BMT-NW would often work on jobs with BMT Tank Co.  BMT-NW would work as a subcontractor of BMT, and upon completion of the work BMT-NW would issue an invoice to BMT for the amounts owed.  These

---

[1] Plaintiffs' encountered a dilemma as they began this litigation.  The amount in controversy was such that their counsel could not afford to depose everyone with relevant information about the finances of Travelstead and his entities.  Plaintiffs asked for information from Travelstead and his lawyer.  The response was negative, ostensibly because Travelstead, by this time, had been relieved of his employment as CEO of BMT-NW and CEO of Broad Street and CEO of BMT Acquisition, NW Acquisition and Graver Tank.

Travelstead claims that he did not have access to the documents that were responsive to the requests for information.  No motion to compel production was filed with this Court.  Instead, at trial, plaintiffs filed a motion requesting adverse inferences regarding damages and fraud.  Without more, there is insufficient basis for the Court to disregard the evidence that was put forth at trial as well as the logic and common sense arguments by the defendants.

In the same vein, Mr. John Wright testified as the accountant for Mr. Travelstead and his entities.  His testimony is summarized in paragraphs 63 to 71 of the Findings of Fact.  The Court was skeptical of the testimony regarding the "amounts due from related entities" and their treatment in financial statements and tax returns.  Plaintiffs did not effectively discredit his testimony with factual evidence of another, plausible explanation, or, for that matter, evidence that there was a tangible asset(s) that could satisfy the obligation.  Therefore, the Court, with regret, accepts Mr. Wright's explanation of a scrivener's error for accounting of a worthless debt.  Without more evidence, this Court is loath to brand someone a liar.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14**

invoices became accounts receivable, "amounts due from related entities," that were reflected as an asset of BMT-NW. At the end of 2010, the balance in this account was $912,000.

65.    This account balance did not reflect amounts due BMT-NW from Mr. Travelstead. This receivable account was not transferred to NW Acquisition as part of the foreclosure because the account had no value.

66.    The balance in this account as of December 31, 2011 was $883,417. The amount increased after July 29, 2011 because of balance sheet adjustments made by Mr. John Wright as part of his end of year accounting work. This adjustment included journal entries related to a prepaid expense and an employee advance. The increase did not relate to or represent any amounts due to BMT-NW from Mr. Travelstead.

67.    In preparing the 2011 tax returns for BMT-NW, Mr. Wright recommended to Mr. Travelstead that the uncollectible receivable be distributed to the members of BMT-NW, Charles and Ann Travelstead. Mr. Wright recommended this action in order to avoid increasing further an already large bad debt balance.

68.    Mr. Travelstead consented to Mr. Wright's recommendation. Mr. Wright then prepared the 2011 tax returns for BMT-NW. The tax returns show a distribution to Mr. Travelstead of $ 883,417. This distribution represented the distribution of the uncollectible receivables.

69.    Mr. Wright also prepared a "Statement of Income and Members' Equity" for the year ended December 31, 2011. This statement included the line item "Members notes distributed to members" with a value of $ 883,417. This statement was made in error by Mr. Wright. The statement should have indicated that what was distributed were "amounts due from

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 15**

related entities." What was actually distributed to members was the worthless receivables and not promissory notes due from members.

70.    Mr. Travelstead did not receive a cash distribution of $ 883,417 at the end of 2011. BMT-NW did not, at the end of 2011, forgive promissory notes owed by Mr. Travelstead.

71.    The distribution of $ 883,417 represented in the financial statements of BMT-NW and in its tax returns did not result in any financial benefit to Mr. Travelstead. This distribution did not deprive Walker or Hamer of the opportunity to recover funds from BMT-NW.

72.    This account was clearly an asset on the books of BMT-NW prior to the foreclosure. It was also an asset in which first Chase and then NW Acquisition had a security interest. Finally, this was also an asset that was transferred to NW Acquisition under the foreclosure agreement. Therefore, even if this account did have value that value would have been due NW Acquisition. The foreclosure agreement required BMT-NW to pay to NW Acquisition any cash received from the acquired assets to be turned over to NW Acquisition.

73.    Therefore, following the foreclosure BMT-NW did not have assets that could pay off its remaining secured debt. BMT-NW also did not have any assets that could be used to satisfy the claims of unsecured creditors. After giving effect to the foreclosure agreement, BMT-NW owed approximately $2 million to unsecured creditors.

74.    As the owner of the foreclosed assets, NW Acquisition chose to use them in a new enterprise. Although almost all of the employees were retained, the company had new ownership, it was subject to the control of a new board of directors and had access to new financing.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 16**

75.     On June 3, 2011, Hamer filed suit against BMT-NW for amounts owed under invoices for services performed by Hamer.  On September 16, 2011, Hamer obtained a default judgment against BMT-NW in the amount of $178,085.93 based on unpaid invoices for services performed for BMT-NW.  The judgment was for an unpaid balance owed Hamer for electrical work performed on BMT-NW's equipment.  Mr. Travelstead took no action to impede the entry of the judgment.

76.     Mr. Travelstead had no contractual obligation to pay the amounts owed Hamer by BMT-NW.

77.     Walker also initiated legal action against BMT-NW for amounts owed under invoices for services provided by Walker.  On September 19, 2011, Walker obtained a default judgment against BMT-NW in the amount of $54,553.64.  The judgment was based on work performed by Walker in applying foam to tanks and other structures.  Mr. Travelstead took no action to impede the entry of the judgment.

78.     Mr. Travelstead had no contractual obligation to pay the amounts owed Walker by BMT-NW.

79.     At the time of the foreclosure, BMT-NW did not have any assets that were not covered by the Continuing Security Agreement, and which would have been available to satisfy the amounts owed to Hamer or Walker.  Following the foreclosure BMT-NW did not have any assets that would have been available to unsecured creditors to satisfy amounts owed to them.

80.     Mr. Travelstead was removed from his position with Broad Street in July, 2013. He did not have the ability to even review, let alone retrieve, financial information about BMT-NW or NW Acquisition after that time.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17**

## CONCLUSIONS OF LAW

<u>Uniform Fraudulent Transfer Act</u>

81.   BMT-NW did not "transfer" an "asset" to NW Acquisition within the meaning of RCW 19.40.011(2)(i), the Washington Uniform Fraudulent Transfer Act ("UFTA").   The UFTA excludes property that is encumbered by a security interest from coverage under the law. All of the assets transferred were encumbered by a valid lien owned by NW Acquisition.  Mr. Clees, the expert witness of Hamer and Walker, testified that all assets of BMT were subject to a valid security interest belonging to NW Acquisition.   Therefore, Hamer and Walker have no claim under the UFTA.

82.   Mr. Travelstead is not "a person for whose benefit the transfer was made" within the meaning of RCW 19.40.081(b)(1) and therefore cannot be personally liable to Plaintiffs under the UFTA.  The transfer was made pursuant to a legal obligation  of Mr. Travelstead as the manager of BMT-NW to tender the company's assets to its secured lender.

83.   No transfer of assets from BMT-NW to NW Acquisition was voidable under RCW 19.40.071(a)(1).

84.   No "actual fraudulent transfer" occurred under RCW 19.40.041(a)(1).

85.   Clear and convincing evidence does not support the conclusion that BMT-NW transferred its assets with actual intent to defraud, delay, or hinder a creditor.  The intent was to satisfy the legitimate demand of a secured creditor for payment of a debt.

86.   Acquisition took BMT-NW's assets in good faith and for reasonably equivalent value such that the transfer is not voidable under RCW 19.40.081(a).  Hamer and Walker did not provide an alternate fair market value of the assets to the ones provided by Mr. Travelstead.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 18**

87.     No constructive fraud occurred under RCW 19.40.041(a)(2).

88.     Substantial evidence does not support the conclusion that BMT-NW received less than reasonably equivalent value.

89.     The transfer to NW Acquisition occurred pursuant to the enforcement of a security interest in compliance with Article 9A of Title 62A RCW and therefore the transfer is not voidable under RCW 19.40.081(e)(2).

90.     No constructive fraud occurred under the meaning of RCW 19.40.051(a).

91.     BMT-NW received reasonably equivalent value for the assets transferred.

92.     The transfer to NW Acquisition occurred pursuant to the enforcement of a security interest in compliance with Article 9A of Title 62A RCW such that the transfer is not voidable under RCW 19.40.081(e)(2).

93.     No insider fraudulent transfer occurred within the meaning of RCW 19.40.051(b)

94.     NW Acquisition was not an insider as defined by RCW 19.40.011(7)(ii).  NW Acquisition was not a director, officer, or person in control of BMT-NW at the time of the transfer.

95.     The transfer to NW Acquisition occurred pursuant to the enforcement of a security interest in compliance with Article 9A of Title 62A RCW such that the transfer is not voidable under RCW 19.40.081(e)(2).

96.     To the extent any transfer to BMT Acquisition or NW Acquisition is deemed a fraudulent transfer, and to the extent BMT Acquisition or NW Acquisition is deemed an insider, such transfer is not avoidable under RCW 19.40.081(f)(1) and (3) because BMT Acquisition and NW Acquisition gave new value after the transfer.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 19**

Breach of Fiduciary Duty

97.     Washington law does not recognize a direct duty of a corporate official to a creditor.  As a result, Mr. Travelstead did not owe a direct fiduciary duty to Plaintiffs.  *See North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007)

98.     To the extent such a duty exists, Mr. Travelstead did not breach any duty owed to Plaintiffs.

99.     Any breach by Mr. Travelstead of a fiduciary duty owed to Plaintiffs did not cause any damage to Plaintiffs.  None of the actions by Mr. Travelstead in connection with the purchase and sale or the Chase Notes, the negotiation and execution of the Foreclosure Agreement or the employment of Mr. Travelstead by NW Acquisition caused the amounts owed Hamer and Walker to be uncollectible. The amounts owed Hamer and Walker by BMT-NW were uncollectible because a secured lender had a superior right to all the assets of BMT-NW to satisfy BMT-NW's obligations to that lender.  The assets did not have sufficient value to pay off the secured debt.  Neither did BMT-NW have the financial ability to continue operations and pay its unsecured creditors in the ordinary course of business.

100.     To the extent Mr. Travelstead owed any direct duty to creditors, his paramount duty was to the secured creditor which supersedes any duty owed to unsecured creditors.

101.     The negotiation and execution of the Foreclosure Agreement was an appropriate exercise of Mr. Travelstead's business judgment.  At the time of the foreclosure, BMT-NW owed, and could not pay, over $ 3.3 million to a secured creditor, it was not able to pay its unsecured creditors and it didn't have sufficient cash to pay an upcoming payroll.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 20**

Piercing the Corporate Veil

102.    To prevail in their claim for piercing the corporate veil, Hamer and Walker must prove that the alleged misconduct of Mr. Travelstead was the proximate cause of the amounts owed Hamer and Walker becoming uncollectible.

103.    None of the actions by Mr. Travelstead in connection with the purchase and sale or the Chase Notes, the negotiation and execution of the Foreclosure Agreement or the employment of Mr. Travelstead by NW Acquisition caused the amounts owed Hamer and Walker to be uncollectible.

104.    The amounts owed Hamer and Walker by BMT-NW were uncollectible because a secured lender had a superior right to all the assets of BMT-NW to satisfy BMT-NW's obligations to that lender.  The assets did not have sufficient value to pay off the secured debt. Neither did BMT-NW have the financial ability to continue operations and pay its unsecured creditors in the ordinary course of business.

105.    Mr. Travelstead did not intentionally use the corporate form of BMT-NW to violate or avoid any duty owed to Plaintiffs.  Mr. Travelstead did not manipulate BMT-NW to his benefit and to the detriment of Plaintiffs.  Mr. Travelstead did not take any action that put assets that would have been available to Hamer and Walker beyond their reach.  *Meisel v. M&N Modern Hydraulic Press Co*, 97 Wash.2d 403, 410 (1982).

106.    The disregard of the form of BMT-NW is not necessary and required to prevent unjustified loss to Plaintiffs.  Hamer and Walker were unsecured creditors of BMT-NW, a company that did not have sufficient assets to satisfy its secured creditor let alone its unsecured creditors.  *Meisel v. M&N Modern Hydraulic Press Co*, 97 Wash.2d 403, 410 (1982).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 21**

Improper Winding Up/Improper Distribution

107.   Mr. Travelstead is not personally liable to Plaintiffs for failing to formally wind up the affairs of BMT-NW under any applicable statutory scheme.   New Mexico law does not require that a limited liability company to wind up its affairs at any particular time.

108.   New Mexico law also does not recognize a cause of action by a third party against a company's manager individually for any failure to wind up the company's affairs under the New Mexico limited liability statute.

109.   New Mexico law also does not recognize a third party action for wrongful distribution of a company's asset.

110.   Inasmuch as BMT-NW had no assets that would have been available to satisfy the claims of unsecured creditors, any failure to formally wind up the affairs of BMT-NW did not cause any harm to Plaintiffs.

111.   Mr. Travelstead did not make any wrongful distribution of assets of BMT-NW. The distribution to Mr. Travelstead did not have any value, and did not deprive Hamer or Walker of the amounts owed them.

Washington Consumer Protection Act

112.   The negotiation, execution and performance of the foreclosure agreement between BMT-NW and NW Acquisition was not an unfair or deceptive act.   *See, Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Company*, 105 Wash.2d 778 (1986).   The acts of BMT-NW and Mr. Travelstead in question did not "have the capacity to deceive a substantial portion of the public."   *Id*.  at 785 (1986).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 22**

113.   The negotiation, execution and performance of foreclosure agreement did not impact the public interest. *Id*.

114.   In order to prevail on a CPA claim, Walker must prove that "but for" the deceptive act, Walker would not have suffered an injury. *Indoor Billboard/Washington Inc. v. Integra Telecommunications of Washington, Inc*., 162 Wn.2d 59, 83-84 (2007)  Proximate cause is a "cause which in direct sequence, unbroken by any new independent cause, produces the injury complained of and without which the such injury would not have occurred."  *Id*.

115.   The negotiation, execution and performance of foreclosure agreement did not cause injury to Walker's business or property. None of the actions by Mr. Travelstead in connection with the purchase and sale or the Chase Notes, the negotiation and execution of the Foreclosure Agreement or the employment of Mr. Travelstead by NW Acquisition caused the amounts owed Walker to be uncollectible.

116.   The amounts owed Walker by BMT-NW were uncollectible because a secured lender had a superior right to all the assets of BMT-NW to satisfy BMT-NW's obligations to that lender.  The assets did not have sufficient value to pay off the secured debt.  Neither did BMT-NW have the financial ability to continue operations and pay its unsecured creditors in the ordinary course of business.

117.   Mr. Travelstead, as the Manager of BMT-NW, is not personally liable under the Consumer Protection Act for any injury to Walker.  At all times Mr. Travelstead was acting in his capacity as the manager of BMT-NW.  He did not commit any individual, wrongful acts that, standing alone, would make him liable to Walker.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**- 23**

Common Law Fraud

118.     In order to state a claim for fraud, Hamer and Walker must prove nine distinct elements.  They are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) an intent that it be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) reliance on its truth; (8) the right to rely thereon; and (9) consequent and proximate injury.  *Markov v. ABC Transfer & Storage Co*., 76 Wash.2d 388 (1969).

119.     Among the proofs required of Hamer and Walker is the demonstration that the alleged fraud was the proximate cause of their economic losses.  No fraudulent act of Mr. Travelstead caused Hamer and Walker to be unable to collect the amounts owed by BMT-NW.  These amounts become uncollectible because a secured creditor exercised its rights and recovered anything of value from BMT-NW.

120.     Furthermore, there is no demonstration by Hamer and Walker that they relied on any action of Mr. Travelstead, or that they had the right to rely on any representation of Mr. Travelstead, in sustaining their losses.  The payables owed by BMT-NW to Hamer and were incurred long before the foreclosure occurred.  They did not rely on any foreclosure – related actions of Mr. Travelstead in performing services.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24**

121.    Hamer and Walker also failed to prove a material representation made by Mr. Travelstead that he knew at the time was false, and that he made the false representation with the specific intent that it be relied upon by Hamer and Walker.

DATED this 13th day of February, 2015.


_____

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

**FINDINGS OF FACT AND CONCLUSIONS OF LAW - 25**